No. 14,361

GRANDBOUCHE *v.* THE PEOPLE.
(89 P. [2d] 577)

Decided April 10, 1939.

Mr. William Hedges Robinson, Jr., Mr. Sidney E. Shuteran, for plaintiff in error.

Mr. Byron G. Rogers, Attorney General, Mr. Reid Williams, Assistant, for the people.

*En Banc.*

Mr. Justice Book delivered the opinion of the court.

The information upon which this case is based contained five counts and charged the plaintiff in error, together with two codefendants, Edna Mae Hewitt and George S. Elstun, with conspiracies to commit the following crimes: (1) larceny by bailee; (2) false pretenses; (3) embezzlement; (4) confidence game; and (5) cheating and swindling. At the commencement of the trial Hewitt pleaded guilty to the second, third and fifth counts of

the information. Plaintiff in error stood mute upon arraignment, whereupon a plea of not guilty was entered for him, and he elected to stand trial, jointly with codefendant Elstun, and was found guilty on the second, fourth and fifth counts. Sentences of from six to ten years were imposed, to run concurrently. At the conclusion of the people's case, on motion of the district attorney, the first and third counts were withdrawn. Reference will be made to plaintiff in error Grandbouche herein as defendant, and his codefendants will be designated by their surnames.

In view of the fact that this case was tried over two years ago, we think it appropriate that something be said concerning the delay in the disposition thereof.

The information was filed April 24, 1936. The trial commenced February 23, 1937, and continued for nine days. March 29, 1938, a bill of exceptions was filed in this court by Elstun, which we, by stipulation, permitted to become a part of the record in the instant case. A supplemental record was filed by defendant June 15, 1938. Brief in support of an application for supersedeas was filed September 15, 1938. Answer brief of the people was filed January 26, 1939. Reply brief of defendant was filed February 28, 1939. On February 10, 1939, a motion was filed by defendant, with consent of the people, for permission to have this matter finally determined upon application for supersedeas, which was granted.

The delay in the disposition of this case is inexcusable. Those who have the responsibility of enforcing and expediting the disposition of criminal cases—and that includes our responsibility—must realize that such delays very seriously impair the proper administration of the criminal law. An expeditious disposition of criminal cases is necessary in the public interest and to a prompt and efficient enforcement of the criminal law. A number of factors enter into this delay, and while we refrain from becoming specific, we again emphatically say that criminal prosecutions should be carried on by

those agencies entrusted with such responsibility as expeditiously as possible, consistent with constitutional obligations, rights and liberties. In fairness, we should say that counsel for defendant here did not represent him at the trial.

Counsel have assigned numerous errors, but we believe they may be condensed as follows: (1) Endorsement of codefendants as witnesses without notice; (2) misconduct of district attorney; (3) errors predicated upon petition for writ of error coram nobis; (4) erroneous admission of evidence; (5) jurisdiction as to the fourth and fifth counts of the information; and (6) instructions erroneously given and refused.

No attempt is made in the briefs to summarize the testimony, and, in view of the circumstances, no abstract of the evidence has been submitted. It therefore was necessary that we read the entire record of approximately 1300 pages, or 3700 folios.

The theory of the people, as to the crimes charged in the second, fourth and fifth counts, was, in effect, that the defendant and Hewitt and Elstun, in their conspiracy as officers and agents of Collateral Bankers, Inc., represented to prospective investors that the business of this concern was a financial success as a dividend-paying enterprise; that oil royalties sold by it, and its capital stock, the preferred especially, and also common, were earning substantial dividends, while in truth and in fact dividends were not being earned on the capital stock of the company; that it actually was insolvent; that such dividends as were distributed by the company were paid out of its capital or from sources other than earnings; and that certificates of stock were issued to intended victims on a fictitious value; all of which was known to defendant and Hewitt and Elstun.

This, substantially, was the scheme or plan said to have been entered into by all of the defendants. Numerous facts reflected in the testimony and reasonably to be inferred therefrom make up the total results; such as the

age and occupation of the victims; manipulation of dividend payments in such a way as to retain their confidence; the promise, impossible of fulfillment, to cash their stock certificates at any time; the assurance of a seven-per-cent dividend, with knowledge of inability to pay; the false assurance that the company could pay seven per cent dividends because of large earnings in the short-time loan business; the oft-repeated false representation that the company was making money; the declaring of stock dividends without financial justification, and the holding by the company for months, and in some instances years, of dividend checks after they were prepared; failure to pay dividends, even though declared; false representations that the securities of building and loan companies held by prospective investors in reliable institutions were financially unsound and would greatly depreciate in value, in order to induce the victims to turn such securities over to defendants to be used in the purchase of capital stock of Collateral Bankers, Inc.; the exhibition of photostatic copies of dividend checks to intended victims, such copies being taken before the originals were delivered to the payees; the sale of oil royalties in one company and delivering deeds of another company, or none at all, and the showing of false financial statements to intended victims to induce them to purchase stock. Two corporations controlled by the defendant through Collateral Bankers, Inc., played an important part in manipulating its financial setup; namely, American Industrial Loan Company and Bush & Company, the assets of which were practically worthless.

The information is predicated upon the dealings which the defendants had with one Emma Nelson, a maiden lady over the age of eighty years, and a resident of Colorado for more than fifty years. Her occupation was that of housekeeper and cook. She had accumulated considerable capital, of which $10,760 was invested with Collateral Bankers, Inc. Hewitt had practically all direct negotiations with Miss Nelson. She was told that the

savings bank in which she had her investments would soon close, and that it was at that time paying fifty-two cents on the dollar; that she would lose her entire capital unless she invested in oil royalties, to be obtained for her by Collateral Bankers, Inc.; that she would obtain seven per cent on the preferred stock of Collateral Bankers, Inc. Many other statements were made to her by Hewitt concerning the earnings of the seven-per-cent stock, and certain documents were shown to her, such as photostatic copies of dividend checks, financial statements, and testimonial letters from various sources. She never received any dividend on the stock in the company held by her. In addition to the cash invested, she also turned over to Collateral Bankers, Inc., a $2,000 mortgage on real estate, proceeds of which were to be used in procuring preferred stock in said company; 160 shares were purchased August 28, 1935; 70 shares September 7, 1935; 136 shares November 1, 1935; 55 shares December 20, 1935, and 200 shares February 20, 1936; which exhausted the $2,000 mortgage. On February 25, 1936, she made the last purchase of 40 shares, for which she paid $400. The money paid for this stock was usually received by the defendant. He also assisted in the negotiations to transfer her savings bank stock and deposits to Collateral Bankers, Inc. It is worthy of note that the United States mails were not used in these dealings, all deliveries and payments being made and accepted in person. Hewitt testified on behalf of the people that she was connected with Collateral Bankers, Inc., as a saleswoman in 1933, again in 1935, and until the company closed its business in April, 1936. Defendant told her that the company was a short-time loan company, and that it was paying seven per cent dividends on the preferred and common stock. He gave her a kit with which to work, which contained numerous documents, such as photostatic copies of dividend checks that they were sending to stockholders. Her commission was twenty per cent on stock sales. She first sold Miss Nelson some American Fidelity royalties on the representation

that they would pay her one and one-half to two per cent per month. She had difficulty and partially failed in obtaining from defendant the American Fidelity royalties which she had sold to Miss Nelson. She delivered different royalty deeds to Miss Nelson, but did not tell her that they were not the deeds of the American Fidelity Company. The representations to Miss Nelson were made pursuant to instructions from defendant.

One of the bookkeepers for the company testified that he had told defendant and Elstun several times that there were no funds in Collateral Bankers, Inc., from which to declare or pay dividends; that the company had short checks in small amounts on many occasions; that the checks were signed by defendant; that they kited checks from one bank to another.

A certified public accountant and investigator for the Securities and Exchange Commission testified that he investigated the books of Collateral Bankers, Inc., and American Industrial Loan Company. From his examination it appeared that they had a loss every year. He itemized the succeeding deficits of Collateral Bankers, Inc., down to February 29, 1936, at which time they amounted to $15,757.21, as shown by the books. From his appraisal of the assets, it was his opinion that the actual deficit on February 29, 1936, was $192,962.77. In 1935 the company paid out approximately $5,000 more in dividends than it had in its surplus account.

Several witnesses testified to similar transactions, for the purpose of showing intent, motive, and the scheme and plan used. Correspondence between agents of the company and defendant discloses that stockholders had continuous difficulty in obtaining their dividend checks after the same were issued, but which were retained by the company.

We shall not attempt to detail all of the voluminous testimony. We have set out sufficient to make it clear that the evidence was fully ample to warrant a finding of guilty by the jury. Conspiracy imports a corrupt agree-

ment between two or more persons, with guilty knowledge on the part of each. A careful perusal of the record leaves no doubt as to defendant's guilt.

■ Defendant urges as prejudicial error the endorsement on the information of the name of defendant Edna Mae Hewitt as a witness for the people, after she had pleaded guilty and immediately prior to the commencement of the trial. She previously pleaded not guilty, and, until she changed her plea, was represented by counsel for defendant. It is reasonable, therefore, to assume that any facts concerning which she would testify would not be a surprise to defendant. Certainly, counsel for the people could not be expected to endorse her name as a witness until she changed her plea. Even then the likelihood of her willingness to testify, under the circumstances, remained in doubt until her voluntary consent had been given. Nor could the materiality of her testimony be ascertained until that time. Moreover, while a motion for a mistrial was made, no continuance of the trial was requested. Under these circumstances, the matter of permitting the endorsement was clearly within the discretion of the trial court, and we find nothing in the record from which we can say that such discretion was abused. *Baker v. People,* 72 Colo. 207, 210 Pac. 323; *Stone v. People,* 71 Colo. 162, 204 Pac. 897.

■ ■ Nor does the record reflect any prejudicial error with regard to the time and place of the entry by Hewitt of her plea of guilty. Where the record fails to show prejudice resulting from judicial proceedings, the reviewing court will not presume to say that it exists merely because counsel deems it necessary to present argument thereon. While we do not mean to infer that the practice of receiving pleas of guilty, under the circumstances disclosed in the present case, should be encouraged, we do not believe that this act was in any way so emphasized during the trial as to make it prejudicial error. All criminal proceedings are required to be public, and unless it clearly appears that this plea was entered

184

with intent to prejudice the defendant, no assumption of prejudice is justified.

█ On the assignment of error based upon certain alleged misconduct of the district attorney, counsel for defendant complains of a reference to Hewitt's plea of guilty during the conduct of the trial. No exceptions were saved to these references. Counsel for defendant in his cross-examination of the witness Nelson asked this question: "Q. Miss Hewitt is the lady who pleaded guilty yesterday?" And the witness answered: "A. Yes sir, that is the lady." This would indicate that defendant's counsel also, during the trial, injected the matter of Hewitt's plea of guilty. The general conduct of criminal trials is, in large measure, within the sound discretion of the trial court, and only for a clear abuse thereof should error be recognized. Statements made by counsel for the people in making his opening and in the closing argument, to which meritorious objection was made, were rejected and carefully restricted by the trial court.

█ Counsel for defendant especially predicates error upon a remark made by the deputy district attorney in his closing argument to the jury. We quote from the record:

"Mr. Gertz (to the jury): Assuming we gave them a fair trial; if there was not any case here it would not be going to the jury—

"Mr. Burke: I object to the remark of the district attorney.

"The Court: He may make the argument in view of the argument made by the defense attorneys.

"Mr. Burke: Save exception to the ruling of the court.

"The Court: Your exception will be noted.

"Mr. Gertz (to the jury):—continuing: Mr. Kelley said to you also, gentlemen, that there is no case; and I say to you, gentlemen, if there were no case here it would not be up to you for your decision, and they know it."

This statement by the deputy district attorney undoubtedly was provoked by the argument of counsel for

defendant, part of which appears in the record. A perusal will disclose that it was highly unfair. Our reading of the complete record convinces us that the defendants had a fair and impartial trial. "The rule is that where the guilt of an accused is evident, incidental improper action upon the part of the prosecuting officer may be overlooked." *Miller v. People*, 70 Colo. 313, 317, 201 Pac. 41. As before stated, the guilt of the accused here is evident. Under the circumstances of the case and in view of the statements of counsel on both sides in their arguments to the jury we are unable to perceive any resultant prejudicial error attributable to any action of the trial court.

The court's Instruction No. 39 contained the following paragraph: "The arguments, statements and objections made by counsel to the court or to each other, and the rulings and orders made by the court, and the remarks made by the court during the trial and not directed to you, should not be considered by you in arriving at your verdict." A similar instruction was given in the case of *O'Loughlin v. People*, 90 Colo. 368, 379, 10 P. (2d) 543, where misconduct by the district attorney was assigned as error, and concerning which we said, "Mere possibility of prejudice is insufficient to warrant a reversal."

Our next concern is errors assigned on denial of a petition for writ of error coram nobis. This petition was filed a considerable time after disposition of a motion for a new trial, and imposition of sentence. Paragraph XXV of the assignment of errors covering this point reads as follows: "That the court erred in not granting an order of writ of error coram nobis for the reason that the petition of this defendant clearly shows that the complaining witness signed the information under threats and duress, and while of unsound mind; that the district attorney improperly aided to conceal one of the witnesses which this defendant intended to cross-examine; that the defendant, Edna Mae Hewitt,

received leniency and promises from the office of the district attorney in order to change her plea of not guilty to guilty, and that the information was not signed when the defendant was arrested.''

The first point made is that the complaining witness, Emma Nelson, signed the information under threats and duress, and while of unsound mind. The information was signed on April 24, 1936. The record shows that Emma Nelson testified at length at the trial of the case on February 23, 1937. Nothing in her testimony indicates that she was in any way unduly influenced in signing the information, and a reading of her testimony convinces us that it was entirely voluntary and that she had a genuine basis for executing the affidavit attached to the information. As to that part of the assignment concerning the concealment of one of the witnesses for the people who failed to appear at the trial, and whom this defendant intended to cross-examine, and as to the change of plea of defendant Hewitt, clearly, these are matters that should have been raised in a motion for a new trial. They have no place in any issues raised in the petition for a writ of error coram nobis. This writ is almost obsolete, and has been abolished by statute in some jurisdictions. Its purpose now is attained by the filing of a motion to set aside the judgment. 16 C. J. 1326, §3118, 34 C. J. 391, §601. Its purpose was to correct such an error of fact in the proceedings as would result in a complete bar to the judgment. 34 C. J. 394. The granting of the writ is not a matter of right, but it is issued only on a showing of cause, and then it is within the discretion of the court whether, on the affidavits presented, it should be allowed. 34 C. J. 399, 400, §615.

In the instant case the court denied the writ. No contention is here made that there was any abuse of discretion in the court's ruling in this regard, and consequently no prejudicial error resulted from the denial. ▮▮ In connection with this assignment it also is alleged ''that the information was not signed when the

defendant was arrested.'' The record shows that the information was filed April 24, 1936, and that it was verified April 27, 1936. This apparent inaccuracy might have been the result of a typographical error. In any event, the objection is nullified by the provisions of section 490, chapter 48, '35 C. S. A., which reads in part as follows: ''No indictment or information shall be deemed insufficient, nor shall the trial, judgment or other proceedings thereon be reversed or affected by any defect which does not tend to prejudice the substantial rights of the defendant on the merits.'' Clearly, no substantial rights of the defendant were prejudiced by reason of the circumstances here considered.

In *Curl v. People,* 53 Colo. 578, 127 Pac. 951, we had before us an information containing two counts, and the question raised was whether the verification was sufficient to cover both. The sufficiency of the affidavit was not challenged until after conviction on a second trial. In disposing of the matter, we said that the defendant had waived his right, under the circumstances, to challenge the sufficiency of the affidavit. In the instant case the question was raised after disposition of the motion for a new trial and passing of sentence. If it had been raised prior to or during the trial a different ruling might have been made.

A considerable portion of the argument of counsel for defendant relates to alleged erroneous admission of evidence. We have carefully considered this assignment; it relates primarily to evidence of similar transactions within the period of time that the conspiracy existed, the purpose of which was to show intent, plan, motive, scheme or design, and the financial condition of the company at such times as the evidence disclosed that defendant, and Elstun and Hewitt represented the company to be in a good financial condition. Much of the evidence was material as showing knowledge on the part of defendants of the financial condition of the company. *Helser v. People,* 100 Colo. 371, 68 P. (2d) 543. The trial

court promptly and fairly restricted this evidence to the purpose for which it was admitted. No immediate purpose could be served by a detailed recital of this testimony. Some of it consisted of extended conversations; other parts of such evidence was in the form of letters. We find no prejudicial error in the court's rulings in this respect.

The next assignment relates to the jurisdiction of the court as to the fourth and fifth counts of the information, in which conspiracy to commit confidence game and selling corporate stock by swindling transactions is charged. Counsel for defendant contend that an information does not lie for such infractions of the law, and rely upon the statutes concerning them. Sections 222 and 321, chapter 48, '35 C. S. A., defining these offenses, provide that any person violating the same "shall be liable to indictment." Our attention is called to article II, section 8, of the Colorado Constitution, which provides, "That, until otherwise provided by law, no person shall, for a felony, be proceeded against criminally otherwise than by indictment." One answer to this contention is that there were three counts in the instant case of which the defendant was found guilty; namely, the second, fourth and fifth. Defendant was sentenced to a term of from six to ten years on each count, the sentences to run concurrently. All counts involve the same transaction, and at the time of sentence the trial court expressly took note of that situation and considered the sentences punishment for one transaction. The objection goes only to the fourth and fifth counts. Assuming, but not deciding, that the contention is good as to the fourth and fifth counts, no prejudicial error exists. *Imboden v. People,* 40 Colo. 142, 161, 188, 90 Pac. 608.

Another answer to counsel's contention is that legislative action as authorized by section 8, article II, of the Constitution permits prosecution upon information of the charges involved. Sections 454, 455 and 458, chapter

48, '35 C. S. A., read together, grant this authorization. *People v. Gibson,* 53 Colo. 231, 125 Pac. 531. Section 222, supra, was enacted in 1879, prior to the legislative authority above mentioned. The act was amended in a minor respect in 1923, showing clearly that prosecution by indictment was not exclusive. Section 321, supra, was enacted in 1919, together with sections 322 and 323. A reading of these sections indicates clearly that prosecution by indictment was not meant to be exclusive, because section 322, supra, expressly refers to informations in connection with this offense. *Dill v. People,* 94 Colo. 230, 234, 29 P. (2d) 1035. No error was committed by the trial court in the prosecution of these offenses by information.

Assignments of error are based on a number of instructions given by the court, but the record does not disclose any objections thereto as required by our Rule 7, and no error, therefore, can be predicated upon the giving of these instructions. *Colorado Midland Co. v. Edwards,* 24 Colo. App. 350, 365, 366, 134 Pac. 248; *Blanchard v. People,* 74 Colo. 431, 222 Pac. 649. From an examination of the instructions we conclude that those given, under all the circumstances, did not constitute a flagrant violation of any rules of law or result in a miscarriage of justice. *Tashima v. People,* 58 Colo. 98, 102, 144 Pac. 200; *Mansfield v. Harris,* 79 Colo. 164, 166, 244 Pac. 474.

Error is assigned to the refusal of the court to give several requested instructions. Instruction No. 6 of these related to the presumption of innocence and was fully covered by several instructions given.

Refused Instruction No. 12 was not warranted by the evidence. The transactions involved covered a period of over a year. The defense did not contend that the absence of dividend payments was due to business failure or business conditions. It was asserted that the company was financially able to declare and pay such dividends.

The closing of the company never became a material fact in the issues tried.

Refused Instruction No. 14 was covered by the given instruction No. 35. Refused Instruction No. 1 was properly covered by the given instruction No. 14.

No prejudicial error was committed by the trial court in its refusal to give these instructions.

Human fallibility cannot be entirely eliminated in the administration of justice. The line of demarkation between mere fallibility and prejudicial error is a matter of degree, depending, in a measure, upon the circumstances in each case. The existence of the will to be fair and impartial on the part of those aiding in the administration of justice always should be present and be disclosed by the record. The existence of that fairness and impartiality is reflected in the record before us.

The judgment is affirmed.

MR. JUSTICE FRANCIS E. BOUCK not participating.